**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**MICHAEL B. TROEMEL**
Lafayette, Indiana

ATTORNEYS FOR APPELLEE:

**CRAIG JONES**
DCS Tippecanoe County Local Office
Lafayette, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE TERMINATION )
OF THE PARENT CHILD RELATIONSHIP )
OF: )
                                  )
D.C., M.H., A.J., D.J., & J.J. (Minor Children), )
                                  )
AND )
                                  )
M.H. (Mother), )
                                  )
        Appellant-Respondent, )
                                  )
            vs. )     No. 79A05-1207-JT-342
                                  )
THE INDIANA DEPARTMENT OF )
CHILD SERVICES, )
                                  )
        Appellee-Petitioner. )
                                  )

APPEAL FROM THE TIPPECANOE SUPERIOR COURT
The Honorable Loretta H. Rush, Judge
The Honorable Faith Graham, Magistrate
Cause Nos. 79D03-1201-JT-12, 14, 16, 18 & 20

**March 15, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**VAIDIK, Judge**

## Case Summary

Ma.H. ("Mother") appeals the involuntary termination of her parental rights to her children, D.C., M.H., A.J., D.J., and J.J. Concluding that clear and convincing evidence supports the trial court's judgment, we affirm.

## Facts and Procedural History

Mother is the biological mother of D.C., born in July 2003, M.H., born in July 2004, A.J., born in May 2005, D.J., born in April 2006, and J.J., born in October 2008.[1] The local Tippecanoe County office of the Indiana Department of Child Services ("TCDCS") became involved with Mother in 2009 after receiving multiple referrals alleging the children had numerous unexcused absences from school and were coming to school hungry and dirty. TCDCS initiated an assessment of the matter and discovered that D.C. had "17 unexcused absences, 6 tardy/truancies, and 2 tardies" from school.

---

[1] A sixth, older child ("B.H.") was removed from Mother's care and placed in a guardianship with the paternal grandmother before the commencement of the underlying proceedings. Consequently, B.H. was not a party to the underlying case and is not subject to this appeal.

R.C. is the biological father of D.C. and M.H., and Jo.J. is the biological father of A.J., D.J., and J.J. The trial court terminated the parental rights of both biological fathers in its June 2012 termination order. Neither father participates in this appeal. We therefore limit our recitation of the facts to those pertinent solely to Mother's appeal.

Exhibits, Vol. 1, Petitioner's Ex. 1 (CHINS Fact Finding Order) at 2.[2]  M.H. had "12 unexcused absences, 7 tardy/truancies, and 2 tardies." *Id.*  In addition, the family home had no heat, the children did not have beds, Mother was behind in her rent, and the assessment case worker testified that on three separate home visits Mother had confined the children in one bedroom because of the "lack of heat" or because she "was cleaning." *Id.*  TACDCS also learned that the three youngest children were behind in their immunizations, and there were no immunization records for the two older children.

As a result of its assessment, TCDCS filed petitions, under separate cause numbers, alleging D.C., M.H., A.J., D.J., and J.J. were all children in need of services ("CHINS").  The children were adjudicated CHINS during an initial hearing in January 2010, but they were allowed to remain in Mother's physical custody as in-home CHINS. In February 2010, the trial court issued a dispositional order formally removing all five children from Mother's legal custody but again allowing the children to remain in her physical care.  The court's dispositional order further directed Mother to successfully complete a variety of tasks and services designed to address her parenting deficiencies and to facilitate reunification of the family.  Specifically, the court's dispositional order, which incorporated a Parental Participation Decree, directed Mother to, among other things: (1) ensure that the children attend all medical appointments and receive all necessary medical, dental, and optical care; (2) make sure that the children attend school regularly, having no unexcused absences, tardies, or truancies as defined by the school;

---

[2] The pages of the three Volumes of Exhibits submitted on appeal are not consecutively numbered.  We therefore cite directly to the individual exhibits throughout this Opinion.

3

(3) ensure that the children have acceptable personal hygiene (bathe, brush teeth, wear clean clothes, etc.); (4) refrain from the use of alcohol and illegal substances, participate in a substance-abuse evaluation, and comply with all requests for random drug/alcohol screens; (5) participate in intensive home-based case management services and follow all recommendations; (6) undergo a psychological evaluation and follow all resulting recommendations; (7) participate in individual therapy and follow all recommendations; (8) not allow anyone to reside in the family home or have any other child in her care without prior permission from TCDCS; and (9) obtain and maintain safe and stable housing suitable for the children with appropriate bedding, functional utilities, and adequate food.

For the next several months, Mother's participation in reunification services was sporadic and ultimately unsuccessful. Although Mother submitted to many drug screens, she tested positive for alcohol in February and May 2010. Mother also was involved in an open eviction proceeding at the beginning of the CHINS case, and when she failed to appear for a hearing in that cause in February 2010, Mother was court-ordered to vacate her home. Mother's landlord filed for a second eviction in April 2010. Mother moved out in May 2010, but she and the children were evicted from the new apartment the following month. Mother also lost her job in May 2010 due to attendance and other issues.

In September 2010, the trial court modified its dispositional order and directed that all five children be removed from Mother's physical custody and placed in foster care following an incident of domestic violence between Mother and one of the biological

4

fathers, Jo.J.  The incident, which occurred while the children were present in the family home, involved both parents beating each other in the head with metal grates from the top of their gas-powered stove.  As a result of the severity of his injuries, Jo.J. was "life[-]lined" to Methodist Hospital's critical care trauma unit with a deep neck laceration and stab wound to the anus with rectal tearing.  Tr. p. 171.  Mother had also suffered several injuries to her lip, forehead, and scalp.

Following the children's removal from Mother's physical care, the trial court modified its dispositional orders to include domestic-abuse and anger-management counseling for Mother.  Mother refused to participate in these programs, repeatedly telling case workers and service providers that participation in these types of classes was "bullsh**" and a waste of her time.  *Id.* at 157.  Mother also was unsuccessfully discharged from individual counseling and other services on multiple occasions throughout the CHINS case due to her failure to engage in services.  In addition, Mother continued to live with and be involved in an on-and-off-again relationship with Jo.J., despite the couple's tendency for domestic disputes and the negative impact their volatile relationship had on the children.

Notwithstanding Mother's overall failure to fully engage in and benefit from services, Mother experienced a period of increased compliance during the early months of 2011.  As a result, TCDCS began increasing Mother's parenting time to include in-home and partially supervised visits in hopes of reunifying the family.  In July 2011, TCDCS increased Mother's parenting time to include partially unsupervised visits in the home.  After approximately three days of these expanded visitation privileges, however,

5

the unsupervised visits were suspended as a result of another incident of domestic violence during which a physical altercation erupted between Mother and Jo.J. During this incident, the children witnessed Jo.J. push Mother, throw her cell phone, and pull her hair. Jo.J. also kicked and dented Mother's car. Nevertheless, Mother continued to allow Jo.J. to live in the family home against TCDCS's admonishments. Mother also continued to refuse to participate in domestic-violence counseling.

Eventually, in January 2012, TCDCS filed petitions under separate cause numbers seeking the involuntary termination of Mother's parental rights to all five children. A consolidated evidentiary hearing on the termination petitions was held in April 2012. During the termination hearing, TCDCS presented significant evidence regarding Mother's failure to successfully complete and/or benefit from a majority of the court-ordered reunification services, individual counseling, anger management, and home-based services. Although Mother had achieved some income and housing stability by the time of the termination hearing, she remained $3900 in arrears for past-due rent and had admitted to TCDCS that her landlord could request she vacate the premises at any time.

TCDCS also introduced considerable testimony establishing that Mother (1) never took responsibility for her role in the children's removal from her care, (2) continued to struggle with anger-management issues, (3) continued to test positive for alcohol throughout the CHINS case, including twice in November 2010 and again in February, May, and September 2011, and (4) never successfully completed individual counseling. As for the children, TCDCS presented evidence establishing that the children's emotional

and behavioral issues were improving and that all five children were living together in a pre-adoptive foster home where they were bonded with their caregivers.

At the conclusion of the termination hearing, the trial court took the matter under advisement. In June 2012, the trial court issued its judgment terminating Mother's parental rights to all five children. Mother now appeals.

**Discussion and Decision**

The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010). "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty issues.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). "Indeed[,] the parent-child relationship is 'one of the most valued relationships in our culture.'" *Id.* (quoting *Neal v. DeKalb Cnty. Div. of Family & Children*, 796 N.E.2d 280, 285 (Ind. 2003)). Nevertheless, parental rights are "not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights." *Id.* (citing *In re D.D.*, 804 N.E.2d 258, 264-65 (Ind. Ct. App. 2004), *trans. denied*). Thus, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.*

When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *D.D.*, 804 N.E.2d at 265. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Here, the trial court made specific findings and conclusions in its

7

termination order. When a trial court enters specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). In deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*; *see also Bester*, 839 N.E.2d at 147. Clear error is that which leaves us with a definite and firm conviction that a mistake has been made. *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997).

In Indiana, before parental rights may be involuntarily terminated, the State is required to allege and prove, among other things:

(B)    that one (1) of the following is true:

    (i)    There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

    (ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

    (iii)    The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C)    that termination is in the best interests of the child; and

(D)    that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).[3] In addition, TCDCS has the burden of pleading and proving each element of Indiana Code section 31-35-2-4(b) by "'clear and convincing evidence'" before the trial court can involuntarily terminate parental rights. *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2). Mother challenges the sufficiency of the evidence supporting the trial court's judgment as to subsections (B) and (C) of the termination statute detailed above. *See* Ind. Code § 31-35-2-4(b)(2).

### I. Conditions Remedied/Threat to Well-Being

Indiana Code section 31-35-2-4(b)(2)(B) requires a trial court to find only one of the three elements of subsection (b)(2)(B) has been established by clear and convincing evidence before properly terminating parental rights. *See L.S.*, 717 N.E.2d at 209. Here, the trial court determined that subsection (b)(2)(B)(i) and (ii) were both established by clear and convincing evidence. Because we find it to be dispositive, we shall only consider whether TCDCS proved by clear and convincing evidence that there is a reasonable probability the conditions resulting in the children's removal and/or continued placement outside of Mother's care will not be remedied. *See* I.C. § 31-35-2-4(b)(2)(B)(i).

In making such a determination, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 511 (Ind. Ct. App. 2001),

---

[3] Indiana Code section 31-35-2-4 was amended by Pub. L. No. 48-2012 (eff. July 1, 2012). The changes to the statute became effective after the filing of the termination petition involved herein and are not applicable to this case.

*trans. denied*. The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the child. *In re M.M.*, 733 N.E.2d 6, 13 (Ind. Ct. App. 2000). Similarly, courts may consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*. The trial court may also consider the services offered to the parent by a county office of the Indiana Department of Child Services and the parent's response to those services as evidence of whether conditions will be remedied. *Id.* at 1252. Finally, the language of Indiana's termination statute makes clear that "it is not just the basis for the initial removal of the child that may be considered for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside of the home." *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*.

Here, in determining that there is a reasonable probability the conditions resulting in the children's removal and/or continued placement outside of Mother's care will not be remedied, the trial court made detailed findings in its termination order regarding Mother's unresolved parenting, domestic abuse, and housing issues, as well as her lack of progress in improving her ability to provide a safe and stable home environment for the children. With regard to Mother's history of domestic violence, the trial court noted that the children were removed from her care in September 2010 "as a result of domestic violence and continued substance abuse," specifically finding that Mother has "consumed

10

alcohol and engaged in a fight resulting in serious injury." Appellant's App. p. 37. The court also noted that in October 2010, the children's paternal grandmother was arrested for possession of marijuana and neglect of a dependent when law enforcement officers "entered Mother's home to serve a warrant on Father Jones. Mother allowed paternal grandmother to continue to reside in Mother's home until about a week prior to the termination hearing." *Id.* The court also specifically acknowledged that Mother "has struggled to maintain stable housing," was "currently $3,900.00 behind in rent," had a "recent criminal history" of "resisting law enforcement, operating a vehicle while never receiving a license and with improper headlights, and forgery." *Id.* at 37-38. The court went on to find that Mother "owes significant fees, costs, and restitution in these causes." *Id.* at 38.

As for Mother's participation in court-ordered services, the trial court specifically found Mother was "unsuccessfully discharged from services on numerous occasions for various reasons including failure to engage in treatment, non-attendance, poor attitude, and being argumentative." *Id.* at 39. The court determined, "Even when services were provided to Mother in her home, she would refuse to participate and often say this is all 'bullsh\*\*.'" *Id.* The court also found that "[d]espite more than two (2) years of services, Mother remained unwilling to change, maintained resistance to any parenting suggestions or ideas, and continually cursed and complained." *Id.*

The trial court also noted Mother's refusal to take responsibility for the circumstances resulting in the removal of the children from her care. In so doing, the court specifically found that TCDCS had made "massive efforts to reunite this family,"

11

but that Mother had been "resistant to services and displayed an inability to get along with service providers." *Id*. at 40. The court concluded:

> 25. [TCDCS] tried numerous different service providers[,] but Mother would only briefly comply then stop participating altogether. Mother continues to blame others for her situation and for the removal of the children from her care. Mother is not able to protect these children and put them as a priority. . . .
>
> * * *
>
> 30. The parents have a long and habitual pattern of failing to follow court orders, failing to comply with rules of probation, and failing to maintain any stability in their adult lives. The parents have made poor choices . . . [and] have not demonstrated a consistent willingness and/or ability to alter the conditions which led to the children's removal.
>
> 31. The [C]ourt notes Mother is a very determined and strong-willed person. The children do have a bond with their Mother. Mother has obtained her CNA [Certified Nursing Assistant] license, has been able to maintain employment during much of the CHINS case, and is currently participating in case management services with Area IV. However, in balancing Mother's short-term compliance with some of the Court's orders against Mother's habitual patterns of conduct, [the] Court finds there is a substantial probability of future neglect or deprivation if these children are placed in Mother's care. [AC]DCS and CASA have legitimate and substantial concerns regarding [the] parents' failure to timely complete services, their significant history of criminal activity, their substance abuse and domestic violence issues, their inability to meet the special needs and the danger such problems pose to their children.

*Id.* at 40-41. Our review of the record leaves us convinced that these findings and conclusions are supported by abundant evidence.

During the termination hearing, it was the general consensus of case managers and service providers that Mother had failed to benefit from the numerous services made available to her for approximately two years. TCDCS case manager Julie Wolendowski informed the trial court that Mother had repeatedly indicated she "wasn't comfortable

12

with attending individual counseling," "didn't think she would get anything out of it," "didn't believe that she needed any help," and "didn't see a need to change and wasn't going to change." Tr. at 172. Wolendowski also stated that Mother had "never indicated to me an understanding of the [e]ffects of domestic violence on the kids," refused to disengage from her relationship with Jo.J., and further informed Wolendowski that Mother's relationship with Jo.J. was "going to happen" so TCDCS was "just going to have to deal with it." *Id.* at 175, 238.

Vivian Leuck, Executive Director of Child & Family Partners, likewise confirmed that Mother had been discharged from anger management and individual counseling services "multiple times" during the CHINS case due to "lack of attendance" and "lack of participation." *Id.* at 152-53. Leuck went on to explain that Mother was allowed to resume services several times despite the fact Mother's attitude was oftentimes "argumentative" and "rude," because the team was "very focused on giving [Mother] as many opportunities as possible" and "all really felt we wanted her to make it." *Id.* at 154. Leuck confirmed, however, that Mother was eventually discharged for a final time as unsuccessful and "[n]ever once did she take responsibility for what brought her into the system, for her anger, for the events." *Id.* at 157. When asked to "reflect now with the gift of hindsight" as to whether there were any other services that could have been offered to Mother that might have improved her chances at success, Leuck answered, "I don't think so[.] I think this team really worked hard on thinking through services and ways to reach [Mother]." *Id.* at 159.

13

Mother's own testimony lends further support to the trial court's judgment. During the termination hearing, Mother confirmed that she never successfully participated in individual counseling during the underlying CHINS and termination proceedings, indicating that although she had met with various counselors she had learned "nothing really, just repeating myself." *Id.* at 101. Mother also admitted to using alcohol on multiple occasions notwithstanding the trial court's order against the consumption of alcohol and to allowing multiple people to live in the family home at various times throughout the underlying proceedings, including Jo.J., the paternal grandmother (who has a guardianship over Mother's oldest child), and various other adults notwithstanding the trial court's standing dispositional order prohibiting anyone from living in the home without prior approval from TCDCS and/or the court.

As previously explained, a trial court must judge a parent's fitness to care for his or her children at the time of the termination hearing, taking into consideration the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the children. *D.D.*, 804 N.E.2d at 266. Where a parent's "pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). Moreover, a trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth are permanently impaired before terminating the parent-child relationship. *In re E.S.*, 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002).

14

After reviewing the record in its entirety, we conclude that clear and convincing evidence supports the trial court's specific findings set forth above. These findings, in turn, provide ample evidence to support the court's ultimate decision to terminate Mother's parental rights to all five children. Mother's arguments to the contrary, emphasizing her self-serving testimony, rather than the evidence cited by the trial court in its termination order, amount to an impermissible invitation to reweigh the evidence. *See D.D.*, 804 N.E.2d at 265.

## II. Best Interests

We next consider Mother's assertion that TCDCS failed to prove termination of her parental rights is in the children's best interests. In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by the Indiana Department of Child Services and look to the totality of the evidence. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In so doing, the trial court must subordinate the interests of the parent to those of the child. *Id.* A trial court need not wait until a child is irreversibly harmed such that his or her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.* at 199.

In addition to the specific findings and conclusions previously cited, the trial court made several additional pertinent findings and conclusions in determining that termination of Mother's parental rights is in all five children's respective best interests. Specifically, the court found that the CASA had been "actively involved" in the case and had "expressed ongoing concerns" with Mother's "lack of progress in services as well as

15

ongoing concerns regarding domestic violence issues, and continued financial and housing instabilities." Appellant's App. at 40. The trial court also specifically found that Mother "refuses to acknowledge a need for change and has consistently failed to invest in services." *Id.*

As for the children, the trial court found that while in foster care "major progress" had been observed in the children's school performance. *Id.* The court also acknowledged the CASA's testimony that the children "need permanency now" and further found that Mother had failed to show a "willingness or ability to care for the children emotionally, physically, educationally, financially, or socially." *Id.* In addition, the court noted the CASA's testimony that the children "want to be adopted and are afraid of . . . Mother." *Id.* The court further acknowledged that the children had reported that they "are physically disciplined by being punched in the stomach and thrown against the wall" in the family home and that TCDCS had "recently been able to locate a foster placement available to adopt all the children as a group and the children have started to transition to the concurrent foster home." *Id.* These findings, too, are supported by the evidence.

The record reveals that case manager Wolendowski and CASA Miller both recommended termination of Mother's parental rights as in all the children's best interests. In so doing, Wolendowski testified that Mother still did not understand "the [e]ffect of the domestic violence [and] the fighting that is present between her and [Jo.J.]." Tr. p. 186. Wolendowski also informed the court that she did not believe Mother was "at a place where she can discontinue her relationship with [Jo.J.]." *Id.*

16

Although Wolendowski acknowledged that recommending termination of Mother's parental rights was a "tough" decision because the children "are not little kids" and the "elder children certainly are keenly aware of who their mother is," she nevertheless remained convinced that termination of Mother's parental rights was in the children's best interests. *Id.* at 187.

CASA Miller's testimony echoed the testimony of Wolendowski. CASA Miller informed the court that her "biggest concern" continued to revolve around the "domestic violence" in the family home and the "safety of the children." *Id.* at 242. CASA Miller further confirmed that the "potential . . . domestic violence in the situation with [Mother] outweighs [the children's] potential loss/trauma" in terminating Mother's parental rights. *Id.*

Based on the totality of the evidence, including Mother's unresolved parenting, domestic violence, anger management, and housing instability issues, coupled with the testimony from Wolendowski and Miller recommending termination of Mother's parental rights, we conclude that clear and convincing evidence supports the trial court's determination that termination of Mother's parental rights is in D.C.'s, M.H.'s, A.J.'s, D.J.'s, and J.J.'s respective best interests. This Court will reverse a termination of parental rights "'only upon a showing of 'clear error'– that which leaves us with a definite and firm conviction that a mistake has been made.'" *In re A.N.J.*, 690 N.E.2d at 722 (quoting *Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992). We find no such error here.

Affirmed.

BAILEY, J., and BROWN, J., concur.